STATE OF MAINE
CUMBERLAND, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-16-319

SUSAN SNOW,

      Plaintiff

v.

                              ORDER

BERNSTEIN, SHUR, SAWYER
& NELSON, P.A., et al.,

      Defendants

STATE OF MAINE
Cumberland, ss. Clerk's Office

JAN 2 0 2017

RECEIVED

In this action plaintiff Susan Snow alleges that defendants Bernstein, Shur, Sawyer &
Nelson P.A. and J. Colby Wallace, Esq. (collectively, BSSN), who previously represented Snow
in certain Probate and Superior Court litigation involving the distribution of her late father's
property, engaged in malpractice in the course of their legal representation. Snow has also
brought claims against BSSN for breach of contract, breach of fiduciary duty, and intentional
infliction of emotional distress.

Before the court is a motion by BSSN to compel arbitration and a countervailing motion
by Snow to stay the threatened commencement of any arbitration proceeding. *See* 14 M.R.S. §§
5928(1) and (2). Briefly stated, BSSN is seeking to send Snow's malpractice claim to binding
arbitration, and Snow seeks to litigate her claim in the courts.

The basis of BSSN's motion to compel arbitration is a provision in the May 11, 2012
engagement letter between Snow and BSSN that states as follows:

### Arbitration

> If you disagree with the amount of our fee, please take up the
> question with your principal attorney contact or with the firm's
> managing partner. Typically, such disagreements are resolved to

the satisfaction of both sides with little inconvenience or formality. In the event of a fee dispute that is not readily resolved, you shall have the right to submit the fee dispute to arbitration under the Maine Code of Professional Responsibility. <u>Any fee dispute that you do not submit to arbitration under the Maine Code of Professional Responsibility, and any other dispute that arises out of or relates to this agreement or the services provided by the law firm shall also, at the election of either party, be subject to binding arbitration.</u> Either party may request such arbitration by sending a written demand for arbitration to the other. If a demand for arbitration is made, you and the firm shall attempt to agree on the arbitrators. If no agreement can be reached within 30 days of receipt of the demand, the party demanding arbitration may designate an arbitrator by sending a written notice to the other party. Within two weeks of that initial designation, the other party shall designate an arbitrator in writing. Thereafter, those two designated arbitrators shall meet promptly to select a third arbitrator. The arbitrators shall conduct the arbitration proceedings according to the procedures under the commercial arbitration rules of the American Arbitration Association and shall hold the arbitration hearing in Maine. The arbitrators shall be bound by and follow applicable Maine substantive rules of law as if the matter were tried in court. Either party shall have the right to appeal a decision of the arbitrators on the grounds that the arbitrators failed to properly apply applicable law.

(emphasis added).

The above arbitration provision is contained in a four page attachment to a May 11, 2012 engagement letter entitled "Standard Terms of Engagement for Legal Services." At the end of the engagement letter Snow signed her name under the following statement, which appears in boldface capitals: "I agree to the terms of this letter including the attached Standard Terms of Engagement."

The scope of representation in Snow's May 11, 2012 engagement letter was amended 14 months later, but the arbitration provision was not amended, and there is no evidence that it was discussed or considered at the time of the amendment.

Snow's opposition to the motion to compel arbitration is based on several of the Maine Rules of Professional Conduct and their interpretation by the Professional Ethics Commission of the Board of Bar Overseers.

Rule 1.8(h)(1) of the Maine Rules of Professional Conduct states that a lawyer shall not "make an agreement prospectively limiting the lawyer's liability for malpractice." Comment [14] to that rule states that this provision "does not . . . prohibit a lawyer from entering into an agreement with the client to arbitrate legal malpractice claims, provided such agreements are enforceable and the client is fully informed as to the scope and effect of the agreement" (emphasis added). Also relevant in this connection is Rule 1.4(b), which states that a lawyer shall explain a matter "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

Lastly, the definition of "informed consent" in Rule 1.0(e) of the Maine Rules of Professional Conduct provides as follows:

> "Informed consent" means a person's agreement to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct. Whether a client has given informed consent to representation shall be determined in light of the mental capacity of the client to give consent, the explanation of the advantages and risks involved provided by the lawyer seeking consent, the circumstances under which the explanation was provided and the consent obtained, the experience of the client in legal matters generally, and any other circumstances bearing on whether the client has made a reasoned and deliberate choice.

Snow has submitted an affidavit stating, inter alia, that no one at BSSN informed her that she was waiving her right to resolve malpractice claims through the court system, that no one at BSSN informed her that she was waiving her right to a jury trial by agreeing to arbitration, and

3

that no one at BSSN informed her of the pertinent differences between resolving disputes through arbitration and through the court system. Snow Affidavit ¶¶ 3-8.

BSSN does not challenge the statements in Snow's affidavit that she was not informed by anyone at BSSN of the consequences of agreeing to binding arbitration. BSSN does note that Snow is a college graduate with a medical degree (she is a physician) and that Snow's affidavit does not state that she was unaware of the consequences of agreeing to binding arbitration.

Pertinent to the various arguments for and against arbitration are several opinions by Maine's Professional Ethics Commission, the First Circuit's decision in *Bezio v. Draeger*, 737 F.3d 819 (1st Cir. 2013), and the effect of the Federal Arbitration Act.

Professional Ethics Commission Opinion # 170, issued in December 1999, reached the conclusion that an agreement at the outset of representation between lawyer and client to submit all malpractice claims to arbitration did not violate Maine Bar Rule 3.4(f)(2)(v), the predecessor to Rule 1.8(h)(1), which contained identical language precluding agreements "prospectively limiting the lawyer's liability for malpractice." In Opinion # 170 a majority of the Commission stated that there is a strong public policy favoring arbitration and that an arbitrator would not be limited in determining whether malpractice had occurred and in awarding damages. The Opinion stated that the Bar Rules did not implicitly prohibit arbitration just because arbitration might affect the odds of a liability finding or the potential leverage of the parties in negotiating a settlement. The Opinion also noted that clients might prefer arbitration to avoid private matters and confidences from being placed on the public record. Finally, the Opinion noted that, generally speaking, arbitration is faster and less expensive.

Opinion # 170 concluded that any arbitration should be clear and should expressly reserve a client's right to the fee arbitration procedure under the Bar Rules and the client's ability

4

to file grievances with Bar Counsel. Three members dissented, arguing that an arbitration provision constituted an unethical limitation of a lawyer's liability for malpractice in violation of Maine Bar Rule 3.4(f)(2)(v).

Professional Ethics Commission Opinion # 202, issued in January 2011, dealt with the related issue of whether an engagement agreement could ethically include a provision waiving a jury trial in the event of a future dispute between lawyer and client. The Opinion did not find a jury trial waiver to be a per se violation of Rule 1.8(h)(1) but focused on the attorney's obligation – if such a provision were proposed – to fully inform the client of the scope and effect of the provision. It equated such a provision with a provision requiring arbitration and noted comment [14] to Rule 1.8 of the Rules of Professional Conduct – quoted above and implemented after Opinion # 170 had been issued – approving agreements to arbitrate malpractice claims but only with the proviso that the client must be "fully informed" as to the scope and effect of arbitration.

Opinion # 202 went on to state that in order to obtain informed consent to either a jury trial waiver or an arbitration agreement, a lawyer must discuss with the client the potential effects from both the theoretical and practical point of view – including such issues as timing, cost, appealability, evaluation of evidence and credibility, the chances of a liability finding, and the perceived difference between litigation and arbitration in terms of the potential leverage in negotiating a settlement.[1]

It is apparent from these two opinions that the Professional Ethics Commission's view of the inclusion of arbitration in engagement agreements has evolved from the largely unqualified approval in Opinion # 170 to the rule in Opinion # 202 that arbitration agreements can be

---

[1] The Opinion further stated that in order to obtain informed consent to a waiver of a client's right to a jury trial, the lawyer must advise the client in writing of the opportunity to seek the advice of independent legal counsel. In this connection it noted that while there is a public policy favoring arbitration, there is no public policy favoring jury trial waivers.

5

included only if the requirement of informed consent is strictly observed. Indeed, many of the arguments offered in Opinion # 202 were points made by the dissenting members of the Commission in Opinion #170.

In part, the evolution of the Professional Ethics Commission's view may result from the 2009 adoption of the Maine Rules of Professional Conduct – with the inclusion of comment [14] to Rule 1.8(h)(1) and the definition of "informed consent" – in place of the former Bar Rules. In part, the evolution of the Commission's view may also result from practical concerns that binding arbitration applicable to future malpractice claims would constitute a significant disadvantage to the client.

Although not cited in Opinion # 202, the ABA Standing Committee on Ethics and Professional Responsibility had issued a formal opinion in 2002 stating that before including a mandatory arbitration provision, "[d]epending on the sophistication of the client and to the extent necessary to enable the client to make an 'informed decision,' " the lawyer should explain the possible adverse consequences as well as the benefits arising from arbitration. Specified examples of the possible adverse consequences were "that arbitration typically results in the client's waiver of significant rights, such as the waiver of the right to a jury trial, the possible waiver of broad discovery, and the loss of the right to appeal." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 02-425 (Feb. 20, 2002).

In countering this authority, BSSN relies on the First Circuit's 2013 decision in *Bezio v. Draeger*. That case involved the same BSSN arbitration provision at issue in this case. Relying on Maine Professional Ethics Commission Opinion # 170, the First Circuit upheld the arbitration provision. 737 F.3d at 823-25. However, the First Circuit decision does not address or even mention the subsequent Opinion # 202, which had been issued in January 2011. In addition, the

6

*Bezio* case involved a plaintiff "who was no stranger to arbitration," having been the subject of a Financial Industry Regulatory Authority (FINRA) arbitration proceeding brought against him by former clients and having himself commenced a FINRA arbitration proceeding against his former employer. 737 F.3d at 821.

In February 2015, subsequent to the First Circuit's *Bezio* decision, an Enduring Ethics Opinion authored by a member of the Professional Ethics Commission, James Bowie, Esq, concluded that Opinion # 202 had not been undermined and requires that a client's informed consent be obtained for any agreement to submit future malpractice claims to binding arbitration. Indeed, the Enduring Ethics Opinion may go farther than Opinion # 202 in suggesting that not only is a client's informed consent required but that the client must be informed in writing of the desirability of seeking the advice of independent legal counsel before agreeing to binding arbitration with respect to future disputes.[2]

The Enduring Ethics Opinion suggests that the First Circuit's *Bezio* decision should be disregarded because it "inexplicably" did not note the adoption of the Maine Rules of Professional Conduct in 2009 or the issuance of Opinion # 202.

While BSSN questions whether an Enduring Opinion authored by one member of the Professional Ethics Commission should be given any authoritative weight, the court does not need to resolve that issue because, independent of the Enduring Opinion, it concludes that under the definition of "informed consent" in Rule 1.0(e) and comment [14] to Rule 1.8, a lawyer entering into a engagement agreement with a client must explain the scope and effect of an

---

[2] Although not entirely clear on this point, Opinion # 202 can be read as only requiring notification of the opportunity to seek the advice of independent counsel with respect to an agreement to waive a jury trial. See n.1 at p. 5 above. It is obvious that binding arbitration would necessarily include a jury trial waiver, but, given the public policy favoring arbitration, a distinction can perhaps be drawn between a simple jury trial waiver and a jury trial waiver as part of an arbitration agreement.

arbitration provision applicable to future disputes between lawyer and client, including possible malpractice claims. The explanation should at a minimum include the absence of a jury trial, the private vs. public nature of an arbitration proceeding as opposed to a trial, the potential differences in discovery, the limitations on appeal, and the relative expenses of arbitration vs. litigation.[3]

For purposes of this case, the court does not have to consider whether further explanation must be provided on issues such as the odds of prevailing in arbitration, potential settlement leverage, and whether a client should be advised to seek the advice of another lawyer, as proposed in Opinion # 202 and/or in Commission Member Bowie's Enduring Ethics Opinion. There may be room for disagreement on those issues. Regardless of whether additional explanation would have been required, BSSN in this instance did not provide Snow with the minimum amount of explanation that the court has concluded above would have been required to elicit informed consent.

Under Rule 1.4(b), the amount of information that would be required to elicit informed consent may vary depending on the sophistication and experience of the client. *See* ABA Formal Opinion 02-425; *Bezio*, 737 F.3d at 823. However, except in a case such as *Bezio*, where the client had actually participated in arbitration on one or more prior occasions, this would not excuse a lawyer from the obligation to outline the scope and effect of an arbitration provision and to make sure the client is informed about the legal and practical consequences of arbitration. If the lawyer asks if the client has had any experience with arbitration and learns that the client has previously participated in one or more arbitrations, this might eliminate some of the need for further explanation. There is no evidence such an inquiry was made in this case.

---

[3]Although Opinion # 170 states that arbitration is generally faster and less expensive, counsel for Snow argues that arbitration would involve greater upfront costs than retaining a lawyer on a contingency fee to pursue a malpractice claim. *See* Plaintiff's Motion to Stay Arbitration at 12 n.4.

Just because Snow had a medical degree and may have understood the concept of arbitration in theory does not mean she was aware that, in the specific context of a claim that BSSN had engaged in professional negligence, arbitration would entail the waiver of a jury trial. It also does not mean that she appreciated the private nature of arbitration proceedings, the effect of arbitration in terms of discovery and appeal, and the upfront expenses that might be involved. In this case, moreover, the boilerplate arbitration provision refers generally to any "dispute" that might arise out of BSSN's services but did specifically advise Snow that a "malpractice" claim would be subject to binding arbitration.

Under the Rules of Professional Conduct and Opinion # 202, the onus is on the lawyer to communicate adequate information and explanation to obtain informed consent to an arbitration provision. That was not done in this case. Accordingly, the arbitration provision in Snow's engagement letter violated public policy, and the court will not enforce that provision.

BSSN also argues that failing to enforce the arbitration provision in this case would be inconsistent with U.S. Supreme Court precedent finding certain state law to be preempted under the Federal Arbitration Act. *See Doctor's Associates Inc. v. Casarotto*, 517 U.S. 681 (1996). In *Casarotto,* the Supreme Court held that state law, "whether of legislative or judicial origin," 517 U.S. at 685, may be preempted if it applies "specifically and solely" to the enforceability of arbitration clauses. 517 U.S. at 688. This was emphasized more than once in the *Casarotto* opinion. *See, e.g.,* 517 U.S. at 687: "Courts may not . . . invalidate arbitration agreements under state laws applicable only to arbitration provisions" (emphasis in original).

The rule that lawyers must provide adequate information and explanation to obtain the "informed consent" of their clients does not apply "specifically and solely" to arbitration provisions but applies generally to any instance in which a lawyer seeks the client's assent and

agreement. Accordingly, the applicable provisions of the Maine Rules of Professional Conduct do not single out arbitration provisions for special treatment and are not preempted under the Federal Arbitration Act.

The entry shall be:

Defendants' motion to compel arbitration is denied, and plaintiff's motion to stay the commencement of threatened arbitration by defendants is granted. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: January __20__, 2017

Thomas D. Warren
Justice, Superior Court